**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2016**

# In the Court of Appeals of Georgia

A16A0242. AMEY v. THE STATE.

PHIPPS, Presiding Judge.

In connection with a drive-by shooting, Terrell Amey was convicted of aggravated assault and cruelty to children. In this appeal, Amey contends that the trial court erred by admitting into evidence a certain letter. We affirm.

At the jury trial, the state's witnesses testified to the following. During the late night of April 14, 2012, Amey was the front seat passenger of an SUV being driven by his adult male cousin. Seated behind the driver was an adult male, who was a close friend of both Amey and the driver. Seated behind Amey was the driver's one-year old son.

The driver received a phone call, and the caller's voice was heard through the SUV's speakers. The caller, who was an adult male cousin of Amey and the driver,

exclaimed that "some boys was trying to jump" on him at a particular Pilot gas station. The immediate reactions by the men in the SUV, as detailed at trial by both the driver and the backseat passenger, led to the shooting underlying this case.

The driver testified, "We all agreed to go down there and see what was going on." When they arrived at the Pilot gas station, the caller was with another relative of the driver. The caller began pointing to a Dodge Charger that was exiting the parking lot. The driver of the SUV inferred from such gesturing that, leaving the scene in that vehicle, "must have been the guys that was trying to mess with them or jump on them." The driver quickly made a U-turn and pursued the Charger. As the driver testified, "[W]hen I went up the road [Amey] told [the backseat passenger] to pass the gun to [him]. When [the backseat passenger] passed the gun [Amey] rolled down the window and he told me to pull up beside [the Charger]." The road, as the driver described at trial, had only two lanes – each for traveling in the opposite direction of the other. The driver recounted what happened when he next steered the SUV into the lane designated for traveling in the opposite direction: "I pulled up beside [the Charger,] and he fired shots." The prosecutor asked for clarification: "And who was the shooter that night?" The driver answered, "Terrell Amey."

2

The backseat passenger gave a similar account at trial. Upon receiving the call, they "proceeded to go to the Pilot." Once there, they saw the "Charger leaving the scene," so they "proceeded to go behind them." Amey asked for his (the backseat passenger's) handgun, which the backseat passenger typically kept on his waistband. The backseat passenger handed his gun to Amey. Amey lowered his window and extended his arm outside the SUV. When the SUV and the Charger were aligned, "[h]e . . . started shooting." The prosecutor asked for clarification, "Who shot that gun?" The backseat passenger answered, "Terrell Amey."

The driver and the backseat passenger were co-indicted with Amey on charges of: (i) aggravated assault upon the driver of the Charger; and (ii) cruelty to children, for committing the aggravated assault in the presence of the driver's minor son. As the driver and backseat passenger acknowledged while on the stand, both had entered negotiated guilty pleas in exchange for their testimony at Amey's trial, and were then residing in prison.

Also at trial, the man who had been driving the Charger at the time it was fired upon took the stand. He described leaving the Pilot, being chased by the SUV, then being fired upon from the SUV's passenger-side window. And a police officer who

3

had investigated the criminal incident testified that several bullets had penetrated the rear quarter panel of the Charger and its trunk.

The state also presented evidence of the letter in question. To introduce that letter, the state called to the stand an assistant district attorney who had been temporarily assigned to the case ("the former ADA"). From that witness, the state elicited testimony that, during the trial preparation period, Amey's lawyer provided to him an envelope with a letter inside. The envelope was hand-addressed to "Terrell Amey"; the sender, the envelope showed, was Amey's cousin who had been the driver of the SUV during the drive-by. The letter inside was also handwritten. It stated, in pertinent part,

> Rell, It hurt me to go along with that lie [the backseat passenger] told when he said yu shot at that car. I'm sorry. I just went along with it because I thought u had left the courtroom and I knew by me taking a plea that I was going to meet up with him in jail. And I didn't want to have to fight him about him saying I told on him. He knew he shot out that back window. Yu was in the passenger seat. Yu was still sleep until the shot went off. But if yu have to go to trial yu know I'm not gone come and lie for him this time. . . . "E" a real dummy. . . . Love ya, Dip

"E," as the prosecutor had elicited from the back-seat passenger, was the back-seat passenger's nickname. And "Dip," as the prosecutor had elicited from the driver, was the driver's nickname.

When the prosecutor had the driver on the stand, however, the prosecutor questioned the driver about whether he had written to family members since his incarceration, and more specifically, whether he could identify the envelope and letter described above. The driver responded that he had written to his family, including one letter to Amey. The driver identified the hand-addressed envelope as the one in which he had mailed his letter to Amey. But when shown the letter (recited, in part, above), the driver claimed that it was *not* the letter that he had placed inside that envelope. As the driver explained, "I didn't write that letter. . . . I sent him a letter but it wasn't saying nothing what that says."

Amey complains on appeal, "[T]he only practical purpose for the admission of the letter was to infer [sic] that it was written by *the defendant* in an attempt to

5

mislead the state."[1] Contending that the trial court erred by admitting the letter in evidence,[2] Amey advances the following arguments.

1. First, Amey argues that the letter was inadmissible for lack of authentication. He cites OCGA § 24-9-901 (a),[3] which provides: "The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Prior to opening statements, the trial court conducted a hearing on the admissibility of the letter. Amey's lawyer made clear that the defense would *not* be seeking to present the letter to the jury and further sought a ruling disallowing the state from using the letter, positing that the state would not be able to authenticate it.

The prosecutor responded,"[The former ADA] could be called to testify he received this [letter] from the Defense." The prosecutor further apprised the court

---

[1] (Emphasis supplied.)

[2] *Alexis v. State*, 313 Ga. App. 283, 286 (2) (721 SE2d 205) (2011) ("Whether to admit evidence is a matter resting in the trial court's sound discretion.") (citation and punctuation omitted).

[3] This case was tried after January 1, 2013, which was the effective date of Georgia's new Evidence Code, including OCGA § 24-9-901 ("Requirement of authentication or identification"). See generally *Moore v. State*, 295 Ga. 709, 713 (3), n. 2 (763 SE2d 670) (2014).

that, during trial preparation, the state asked the driver about the letter and the driver denied writing it. Positing that the letter was nevertheless admissible, the prosecutor explained,

> The letter is not being offered as to prove the truth of the matter asserted in that, quite the contrary. That it is in fact *not* true, that there was a falsity made in this case that was attempted to be perpetrated on the State. It was offered by the Defense as something that this co-defendant [driver] had written, which he apparently has not.[4]

After hearing additional argument from both sides, the Court overruled the defense objection, and the state introduced the letter (and the envelope) as set forth above.

Maintaining that the letter was inadmissible for lack of authentication, Amey points out that the state adduced no witness who saw the letter being written, presented no testimony by a handwriting expert or a witness familiar with the handwriting, and introduced no other writing with which the jury could compare the letter. Amey concedes in his brief that "he was, at one point, in custody of [the letter]," but he recites language in *McCombs v. State*[5] that "'[i]t would . . . be a very

---

[4] (Emphasis supplied.)

[5] 109 Ga. 496 (34 SE 1021) (1900).

7

unsafe rule to hold that the possession and ownership of a . . . document may authorize an inference that the owner . . . did write the matter contained in it.'"[6]

We agree with the state that it sufficiently authenticated the letter pursuant to OCGA § 24-9-901 (b), which allows for authentication based upon its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."[7] As the state concedes (and as the record demonstrates), "the letter was offered to show that [Amey] fabricated [a document] in an attempt to deceive the [s]tate and avoid punishment." Hence, the state had the burden of presenting "sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury."[8]

---

[6] Id. at 499 (1), quoting *Van Sickle v. People*, 29 Mich. 61, 65 (1874).

[7] OCGA § 24-9-901 (b) (4). Accord *State v. Smith*, 246 Ga. 129, 130 (269 SE2d 21) (1980) (recognizing that "possession, together with other circumstances, may meet the burden" of establishing authenticity of a document) (citation and punctuation omitted).

[8] *Brown v. State*, 332 Ga. App. 635, 639 (2) (774 SE2d 708) (2015) (citations and punctuation omitted) (addressing authenticity requirements under OCGA § 24-9-901).

8

Here, the contents and substance of the letter demonstrated that its author knew details of the drive-by shooting, including the occupants of the SUV and their seating arrangement. The author of the letter was familiar with the driver's and backseat passenger's nicknames: "Dip" and "E." The letter was written by someone who knew that Amey's traveling companions/co-indictees had pled guilty to the charges and agreed to testify against him – a fact of which Amey would have been aware through discussions with his attorney. The version of events set forth in the letter – that Amey had been asleep until the gun was discharged – was consistent with a conclusion that Amey was not guilty, even as a party to the crimes. Moreover, the letter contained purported admissions that the driver had perjured himself by falsely testifying that Amey was the shooter; but nothing in the record shows what the driver might have gained from thereby admitting perjury. Amey, on the other hand, stood to gain support for a defense that might have exonerated him of all charges. As Amey concedes, the letter had been in his possession. And his lawyer subsequently gave it to the former ADA. Furthermore, although the letter was purportedly signed by the driver, the driver disclaimed writing it.

In light of these circumstances, the state carried its burden of presenting sufficient evidence to make out a prima facie case that the letter was authored by

9

Amey.[9] Because the trial court thus did not err by rejecting Amey's authentication objection, this evidentiary challenge provides no basis for disturbing the judgment of conviction.

2. Alternatively, Amey argues that the letter should have been excluded under OCGA § 24-4-403, which states: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." According to Amey, "The letter here

---

[9] See *Smith*, supra (holding that a document found in defendant's possession and purportedly written by defendant's accomplice was sufficiently authenticated as written by the accomplice, given the document's content and references to "circumstances [that] were peculiarly within the knowledge" of the accomplice); *Armstrong v. State*, 249 Ga. App. 772, 775 (3) (549 SE2d 545) (2001) (explaining that trial court did not err by overruling authentication objection to unsigned notes that were addressed to, and received by, defendant's accomplice, where there was circumstantial evidence that the defendant had penned the notes, including: the notes accomplice received threatened him if he "snitched," and the only person against whom the accomplice had agreed to testify was the defendant); *Weathers v. State*, 198 Ga. App. 871-872 (3) (403 SE2d 449) (1991) (explaining that the state made a prima facie showing of authenticity that the defendant's alleged accomplice had authored a letter to the District Attorney that offered to testify against defendant if his sentences were shortened, because despite the alleged accomplice's subsequent denial of authoring the letter, the letter bore the alleged accomplice's correct name and address, the contents of the letter "indicated that its author had first-hand detailed knowledge of how the crime had been committed," and the alleged accomplice "had a peculiar interest" in penning the letter).

10

offered scant probative value and any such value was substantially outweighed by the prejudicial effect its admittance undoubtedly had on the jury. In this case it would have been impossible for a jury person, after the admittance of such a letter, to judge this case fairly."

Pretermitting whether Amey waived this issue by failing to raise it before the trial court,[10] we find the argument without merit.

> [T]he plain meaning of OCGA § 24-4-403's text makes clear that the trial court may only exclude relevant evidence when its probative value is "substantially outweighed" by one of the designated concerns. Indeed, the Eleventh Circuit has described Rule 403 as "an extraordinary remedy which the … court[s] should invoke sparingly, and the balance should be struck in favor of admissibility." Obviously, the reason for such caution is that relevant evidence in a criminal trial is "inherently prejudicial."[11]

---

[10] Compare OCGA § 24-1-103 (a) (1) ("Error shall not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."), with OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.").

[11] *Williams v. State*, 328 Ga. App. 876, 879 (1) (763 SE2d 261) (2014) ("OCGA § 24-4-403 . . . tracks Federal Rule of Evidence 403.") (footnotes omitted). "Given the similarity between Georgia's new evidence code and the Federal Rules of Evidence it is proper that we give consideration and great weight to constructions

11

The letter was introduced as evidence of Amey's guilty consciousness relating to the shooting incident. "Evidence of [Amey's] consciousness of guilt was certainly relevant at his trial."[12] Our review of the record convinces us that the letter was not rendered inadmissible for reason that its relevance was "substantially outweighed" by any "danger of unfair prejudice."[13] Consequently, this evidentiary challenge provides no basis for disturbing the judgment of conviction.

*Judgment affirmed. Dillard and Peterson, JJ., concur.*

---

placed on the Federal Rules by the federal courts." Id. at 879 (1), n. 14 (citation and punctuation omitted).

[12] *Bostic v. State*, 294 Ga. 845, 849 (2) (757 SE2d 59) (2014) (citation omitted).

[13] OCGA § 24-4-403; see *Bostic*, supra at 848-849 (2) (rejecting argument that evidence of defendant's statements made while awaiting trial – that he "would 'win his case,' because 'his people [would] put the guy that ID'd him at the scene of the crime . . . to sleep,' which would mean that the State would 'not be able to go to the grand jury and indict him and he will walk free'" – was inadmissible as unfairly prejudicial, where such evidence was relevant to show defendant's "consciousness of guilt"); *Williams*, supra.